# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 52551

| | | |
|---|---|---|
| PETER STEVEN LERIGET, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Moscow, April 2026 Term |
| | ) | |
| v. | ) | Opinion filed: August 11, 2026 |
| | ) | |
| THE ROMAN CATHOLIC DIOCESE OF | ) | Melanie Gagnepain, Clerk |
| BOISE, and ST. MARY'S CATHOLIC | ) | |
| CHURCH, | ) | |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Latah County. John Judge, District Judge.

The judgment of the district court is affirmed.

James Vernon & Weeks, PA, Coeur d'Alene, for Appellant. Melanie E. Baillie argued.

Cosho Humphrey, LLP, Boise, for Respondents. Stanley W. Welsh argued.

_____

MOELLER, Justice.

This case concerns allegations of clerical sexual abuse against a minor dating back almost sixty years. Peter Steven Leriget alleges that he was sexually assaulted by Father Patrick O'Sullivan in his family home in 1968 when he was nine years old. At the time, Father O'Sullivan was as a priest at St. Mary's Catholic Church in Moscow, Idaho, where Leriget's family attended church and he attended school. Father O'Sullivan passed away in 1993. Leriget never reported this incident to anyone until 2019, when he disclosed it to his therapist.

In 2021, Leriget filed suit against the Roman Catholic Diocese of Boise ("Diocese of Boise") and St. Mary's Catholic Church ("St. Mary's") (collectively "the Diocese"), claiming damages under the theory of constructive fraud. He alleged that the Diocese endorsed Father O'Sullivan as a trustworthy figure with spiritual authority while concealing known dangers that

there were pedophilic priests, thereby creating a power dynamic that Father O'Sullivan took advantage of to abuse him. The district court granted summary judgment in favor of the Diocese, concluding as a matter of law that Leriget could not establish the essential elements of constructive fraud. Leriget now appeals to this Court. For the reasons discussed below, we affirm the district court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Peter Leriget was born in 1959. He was nine years old during the events that precipitated this case. Leriget was raised in a devout Catholic household in Moscow, Idaho, where he attended the St. Mary's Catholic School and Church, both as a parishioner and student from kindergarten until fifth grade. St. Mary's is a parish in Moscow and is located within the Diocese of Boise. The Diocese of Boise is an Idaho nonprofit corporation with its bishop acting as its sole director. It is a separate and distinct entity from other parishes, dioceses, and Catholic entities, and operates under the Canon Law of the Roman Catholic Church as a "public juridic person."

During his education at St. Mary's, Leriget maintains that in addition to traditional elementary school subjects, he was taught about the Catholic Church's seven sacraments, which he describes as the "most fundamental and important things the Church provides." Among the sacraments is the Sacrament of Holy Orders, which is conferred on priests. Leriget alleges he was taught that Catholic priests have sacred powers directly from Jesus Christ. He also was consistently taught that priests are the "embodiment of Christ on earth" and, as such, are sacred and holy men. As part of his religious studies, he maintains that he learned that a priest is "the Heavenly Father's proxy on earth and, thus, a priest is our Holy Father." Leriget further asserts that the Diocese taught its members not to question priests. Moreover, Leriget alleges: "The idea that a priest would have any sexual desire let alone sexual motivation or deviancy would never have crossed my mind in my wildest dreams. Although I knew very little about sexual stuff at that age, I knew that priests didn't do it." He claims that the Diocese never informed Leriget or his parents that there were priests who could be unsafe or "sinful."

Father O'Sullivan was assigned to St. Mary's in 1968 and Leriget recalls that he met him the same year, either at school or at catechism (the study of the Church's doctrines, beliefs, and practices). Leriget alleges that Father O'Sullivan spent a lot of time visiting with his family at his parents' home, joining them for dinner, and drinking alcohol with his parents.

2

The alleged sexual assault occurred sometime in the summer of 1968. Leriget claims that Father O'Sullivan offered to babysit him for a few hours while his parents were away. His parents agreed. After they left, Leriget claims that Father O'Sullivan asked to see his bedroom, where he violently raped him. When the sexual assault concluded, Father O'Sullivan allegedly told Leriget not to tell anyone because it "would be bad" for him. Leriget also recounts that Father O'Sullivan implied that, if he told anyone, Leriget would get in trouble or go to hell. Leriget did not report the incident to anyone, including his parents, and no criminal charges were ever filed against Father O'Sullivan. Father O'Sullivan died in 1993.

Leriget states that there were no other incidents of abuse against him by Father O'Sullivan before or after the assault in 1968. He acknowledges that he did not tell anyone of the assault for over five decades, first telling his counselor in 2019, and later his attorneys, his wife, and his mother in 2020.

## B. Procedural History

On March 16, 2021, Leriget filed a complaint alleging constructive fraud against the Diocese, requesting damages, and demanding a jury trial. In his complaint, Leriget alleged that the Diocese misrepresented and failed to disclose the dangers of pedophilic priests in its clergy, which Leriget relied upon to his detriment. On April 29, 2021, the Diocese filed an answer denying the allegations in the complaint and asserting several affirmative defenses. The Diocese later filed a motion for summary judgment on the basis that Leriget's claim of constructive fraud failed as a matter of law. Leriget filed an opposition to the motion for summary judgment, arguing that there were material issues of fact that should be left for a jury to decide.

Following a hearing on the motion for summary judgment, the district court granted the Diocese's motion. The district court first addressed the issue of whether a relationship of trust and confidence existed between Leriget and the Diocese, a foundational requirement for a claim of constructive fraud. It ruled that Leriget had failed to establish that his relationship with the Diocese was beyond that of a general church member. Moreover, the court reasoned that he could not prove the existence of a relationship of trust and confidence without implicating the First Amendment. The court explained:

> The trust and confidence Leriget had in the Diocese was based on the general religious teachings of the Catholic church that all parishioners and Catholic students were exposed to, not on any particular ties Leriget had to Father O'Sullivan or the Diocese's knowledge and sponsorship of that relationship.

For these reasons, any finding by a jury of a relationship of trust and confidence between Leriget and [the Diocese] would necessarily involve *an inquiry into church doctrine and core religious beliefs of the Catholic church* to understand any power differential between Leriget and the Church or the influence the Church had over Leriget.

(Emphasis added). Additionally, the court rejected Leriget's assertions that a relationship existed based on either *in loco parentis*[1] or a commercial transaction between his parents and the Diocese due to their payment of school tuition.

The district court further concluded that, even if a jury could find a relationship of trust and confidence between Leriget and the Diocese, Leriget could not prove that the Diocese made a false representation of fact without improperly determining the veracity of Catholic Church doctrine regarding its clergy and priesthood. Additionally, it determined that Leriget could not establish a false representation based on the church's failure to warn him of pedophilic priests because there was no evidence that the Diocese had any notice of the danger. Finally, the district court rejected the Diocese's alternative argument that Leriget's claim is barred by the doctrine of laches, finding that the delay in asserting the claim did not cause any prejudice to the Diocese. Leriget timely appealed.

## II.    STANDARDS OF REVIEW

This Court reviews a grant of summary judgment de novo, employing the same standard used by the district court in ruling on the motion for summary judgment. *Kelso v. Applington*, 173 Idaho 738, 742, 548 P.3d 363, 367 (2024). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Summerfield v. St. Luke's McCall, Ltd.*, 169 Idaho 221, 228, 494 P.3d 769, 776 (2021) (quoting I.R.C.P. 56(a)). "All disputed facts are to be construed liberally in favor of the nonmoving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party." *Foster v. Traul*, 145 Idaho 24, 28, 175 P.3d 186, 190 (2007).

## III.    ANALYSIS

Leriget asks this Court to reverse the district court's order granting summary judgment, which concluded as a matter of law that he could not establish two essential aspects of a constructive fraud claim. The district court also devoted much of its analysis to discussing the First

---

[1] "Of, relating to, or acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent." *In loco parentis*, Black's Law Dictionary (12th ed. 2024).

Amendment implications raised in this case. While we agree that these constitutional concerns are important, we will begin our analysis by focusing on the nature of constructive fraud itself.

First, we have explained that "[c]onstructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *McGhee v. McGhee*, 82 Idaho 367, 371, 353 P.2d 760, 762 (1960) (quoting 37 C.J.S. *Fraud* § 2, at 211; then citing *Madden v. Caldwell*, 16 Idaho 59, 100 P. 358 (1909); then citing *Devers v. Greenwood*, 293 P.2d 834 (Cal. Dist. Ct. App. 1956); and then citing *Bell v. Bell*, 39 P.2d 629 (Ariz. 1934), *superseded in statute*, Ariz. Code Ann. 21-305 (1939), *on other grounds*, *as recognized in*, *Schuster v. Schuster*, 251 P.2d 631 (Ariz. 1952)). As an initial inquiry, constructive fraud requires a "breach of duty arising from a relationship of trust and confidence" between the plaintiff and defendant. *Doe v. Boy Scouts of Am.*, 159 Idaho 103, 109, 356 P.3d 1049, 1055 (2015).

Second, when alleging constructive fraud, a plaintiff must establish by clear and convincing evidence seven of the nine elements of actual fraud. *Id.* at 108, 356 P.3d at 1054. These seven elements are: (1) a statement or representation of fact, (2) the falsity of the statement or representation, (3) the materiality of the statement or representation, (4) the hearer's ignorance of the falsity of the statement, (5) reliance by the hearer, (6) that the reliance was justifiable, and (7) resultant injury. *Id.* (citing *Glaze v. Deffenbaugh*, 144 Idaho 829, 833, 172 P.3d 1104, 1108 (2007)). Unlike a case where actual fraud has been alleged, constructive fraud does not require proof of the speaker's knowledge of the falsity of the statement and the speaker's intent to induce reliance—rather, intent is inferred from the nature of the relationship and the breach. *Id.* at 109, 356 P.3d at 1049; *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 601, 150 P.3d 288, 294 (2006).

Thus, to overcome the summary judgment ruling issued by the district court, Leriget must establish on appeal that, based on the record below, there are genuine issues of material fact concerning whether (A) he had the requisite relationship of trust and confidence with the Diocese and (B) he can satisfy each of the elements of constructive fraud. We will discuss both requirements in turn.

**A. The district court did not err in concluding that the undisputed facts in the record fail to establish that a relationship of trust and confidence existed between Leriget and the Diocese.**

On appeal, Leriget contends that a relationship of trust and confidence existed between him and the Diocese based on his involvement with St. Mary's as a student, his participation in catechism and the sacraments, and Father O'Sullivan's frequent visits to his home.

A relationship of trust and confidence exists "whenever trust or confidence is reposed by one person in the integrity and fidelity of another." *McGhee*, 82 Idaho at 371, 353 P.2d at 762. When considering a constructive fraud case on summary judgment, the question is "whether there is sufficient evidence in the record from which a jury could reasonably find that [the defendant] occupied a superior position of influence and authority over [the plaintiff], and whether, in turn, [the plaintiff] reposed trust and confidence in [the defendant]." *Doe v. Boy Scouts of Am.*, 329 F. Supp. 3d 1168, 1184 (D. Idaho 2018).

A fiduciary relationship is one type of relationship of trust and confidence that can sustain a constructive fraud claim, although it is not the only type. *Davis v. Tuma*, 167 Idaho 267, 277, 469 P.3d 595, 605 (2020). "Examples of relationships from which the law will impose fiduciary obligations on the parties include when the parties are: members of the same family, partners, attorney and client, executor and beneficiary of an estate, principal and agent, insurer and insured, or close friends." *Taylor v. McNichols*, 149 Idaho 826, 846, 243 P.3d 642, 662 (2010) (quoting *Mitchell v. Barendregt*, 120 Idaho 837, 844, 820 P.2d 707, 714 (Ct. App. 1991)). Whether a relationship of trust and confidence exists is a fact-intensive inquiry. Under Idaho law, "[e]quity has never bound itself to any hard and fast definition of the term 'confidential relationship' and has not listed all the necessary elements of such a relationship but has reserved discretion to apply the doctrine whenever it believes a suitable occasion has arisen." *Klein v. Shaw*, 109 Idaho 237, 240, 706 P.2d 1348, 1351 (Ct. App. 1985).

We first turn to Leriget's claim that he and the Diocese were in a relationship of trust and confidence because of his involvement with St. Mary's parish. This Court has not yet had the occasion to address whether a legal relationship of trust and confidence exists between a church and a parishioner. Other courts have held that "the plaintiff may not merely rely on the church's status in general, but must come forward with facts demonstrating that his or her relationship with the institution was somehow unique or distinct from the institution's relationship with other parishioners generally." *G.T. v. Roman Cath. Diocese of Brooklyn, N.Y.*, 211 A.D.3d 413, 414,

6

(N.Y. App. Div. 2022) (citation omitted); *see also Fortin v. Roman Cath. Bishop of Portland*, 871 A.2d 1208, 1218, 1220–22 (Me. 2009) (the plaintiff was a student and an altar boy in the church); *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 203 & n.8 (D.D.C. 2022) (the plaintiff was an altar boy in the church); *Doe v. Liberatore*, 478 F. Supp. 2d 742, 766–67, 771 (M.D. Pa. 2007) (the plaintiff was an alter server and sacristan in the church).

Here, Leriget has not established that his involvement in St. Mary's extended beyond that of any other parishioner or student. While he participated in catechism and the sacraments, nothing in the record suggests that his involvement extended beyond that of the general membership of the church. There is no evidence he served as an altar boy or participated in other forms of heightened participation in church activities. To find that the Diocese stands in a relationship of trust and confidence with each of its members merely by virtue of church membership would extend the scope of the duty too far. Moreover, while Leriget remembers Father O'Sullivan frequently visiting his home for weekly dinners and drinking with his parents, there is no evidence that the Diocese sponsored these regular visits or even knew about them. The alleged abuse by Father O'Sullivan did not occur during a church-sponsored event—it occurred when Leriget's parents accepted the priest's offer to babysit their son. There is no indication in the record that this was a typical priestly duty in the Catholic Church or that the Diocese ever held its priests out as suitable babysitters. Thus, Leriget cannot establish a relationship of trust and confidence based solely on his church membership and involvement.

Rather than focusing on the *relationship of trust and confidence* necessary to establish constructive fraud, Leriget attempts to analogize his theory to the *special relationship* found in negligence law. This Court addressed the special relationship between a church and a church member in the context of a negligence claim in *Beers v. Corporation of President of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 316 P.3d 92 (2013). There, a teenage girl was injured when she jumped off a bridge into a river following an event that was loosely organized by her ward (a local congregation of the Church of Jesus Christ of Latter-Day Saints similar to a Catholic parish). *Id.* at 683–84, 316 P.3d at 95–96. Because the incident occurred after the conclusion of the event—one which the ward did not compel the minor to attend and which occurred a mile away from where the ward-sponsored event was located—this Court held that the ward did not have custody and control over the minor at the time of the injury; thus, there was no special relationship. *Id.* at 687, 316 P.3d at 99. Importantly, while the parties frequently cite this

7

case, *Beers* was a negligence case and did not concern a claim of constructive fraud, rendering it of little utility here.

Next, we turn to Leriget's assertion that he had a relationship of trust and confidence with the Diocese based on his involvement in secular activities—mainly his attendance at the church-sponsored private school. Leriget maintains that since he attended school at St. Mary's, which is owned by the Diocese of Boise and operated by the priests assigned there, "the Diocese stepped into a quasi-secular role traditionally held by public or private schools."

This Court has held that an affirmative duty to protect may arise in the negligence context when the defendant "ha[s] control over someone or a duty to protect that person," such as "a parent's duty to control his child." *Beers*, 155 Idaho at 686, 316 P.3d at 98 (citation omitted). We have held that, depending on the circumstances, there may be a special relationship between a school and its students:

> Generally, schools owe a duty to supervise the activities of their students whether they be engaged in curricular activities or non-required but school sponsored extra-curricular activities . . . [to] anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers. The child may sue the school district for injuries resulting from its failure to protect the child.

*Rife v. Long*, 127 Idaho 841, 846, 908 P.2d 143, 148 (1995) (internal citations omitted). However, this Court also noted that once school has concluded and the student is released, the school no longer has "control over the child's well-being." *Id.* at 847, 908 P.2d at 149.

Importantly, the record lacks evidence demonstrating that Father O'Sullivan was present at, participated in, or otherwise had any involvement with Leriget's schooling at St. Mary's. Leriget alleges that Father O'Sullivan abused him in his family home while babysitting him. While Father O'Sullivan may have had control over Leriget as his babysitter, this position of control was bestowed on him by Leriget's parents, not by the Diocese. The alleged abuse did not occur on school grounds or at a school-sponsored event, and it occurred during the summer outside of school hours. There is also no evidence in the record that the Diocese had any knowledge that Father O'Sullivan frequented the Lerigets' home, consumed alcohol there, or provided babysitting for them or anyone else in the parish.

Again, we do not suggest that the *special relationship* discussed in *Beers* and *Rife*, both of which concerned negligence claims, is equivalent to the *relationship of trust and confidence* required for constructive fraud. Rather, even assuming that Leriget's attendance at St. Mary's somehow gave rise to a special relationship, it would still be limited by the extent to which the

8

school exercised control over Leriget. Here, the alleged abuse clearly occurred while Leriget was outside of St. Mary's control. Thus, even if *Rife* applied, it would not support Leriget's claim.

In conclusion, we agree with the district court's determination that Leriget has failed to establish the existence of a relationship of trust and confidence between himself and the Diocese based on his general church membership and involvement, or on his attendance at the St. Mary's school. Accordingly, summary judgment was appropriate as a matter of law.

**B. The district court did not err in concluding that the undisputed facts in the record fail to establish that the Diocese committed constructive fraud by omission of a material fact.**

Even if a jury could find that Leriget and the Diocese were in a special relationship of trust and confidence, Leriget must also prove that the Diocese breached that duty by making a false representation of material fact. Leriget claims that the Diocese falsely represented that all priests are holy, safe, and trustworthy. He also asserts that the Diocese knew of unsafe pedophilic priests within the Diocese of Boise and the Catholic Church as a whole but failed to disclose these dangers to its congregation.

As noted above, unlike actual fraud, constructive fraud requires no proof of intent; the claimant only needs to prove the existence of a relationship of trust and confidence, rather than the speaker's knowledge that the statement was false. *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 601, 150 P.3d 288, 294 (2006). However, this Court has held that "constructive fraud comprises all acts, omissions and concealments," explaining that "where . . . there was a duty to speak because of a confidential relationship, a failure to do so is a specie of fraud for which equity may afford relief." *McGhee*, 82 Idaho at 371–72, 353 P.2d at 762–63; *see also Humphries v. Becker*, 159 Idaho 728, 736, 366 P.3d 1088, 1096 (2016) ("Omission of information may constitute fraud when a duty to disclose exists.").

Although constructive fraud does not require proof of intent, a claim premised on nondisclosure still depends on the existence of a duty to disclose, which in turn necessarily arises only where the defendant had knowledge of the danger. To be clear, the Free Exercise Clause of the First Amendment does not shield a church from liability when it knowingly assigns sexual predators to positions of authority over parishioners. Other courts have also recognized that liability may arise where a church fails to disclose known histories of sexual misconduct. For example, in *Fortin v. Roman Catholic Bishop of Portland*, a church bishop had knowledge that a priest was sexually abusing minor boys but did not intervene. 871 A.2d 1208, 1215, 1222 (Me.

9

2009). After determining that a relationship may exist, the court concluded that there were no religious beliefs the church could point to that would have prevented the bishop from taking action or informing the police. *Id.* at 1222. Similarly, in *Doe v. Roman Catholic Diocese of Greensburg*, the court held that Doe had sufficiently pleaded "failure to speak" for constructive fraud, again pointing to the church's knowledge of the priest's misconduct: "Doe's claim is not just based on false representation, but also on misrepresentation through failure to disclose a material fact as to [the priest] of which the Greensburg Defendants were aware." 581 F. Supp. 3d 176, 209–10 (D.D.C. 2022).

Here, Leriget claims that the record establishes a genuine issue of material fact as to whether the Diocese had knowledge that pedophilic priests existed within the Catholic Church prior to 1968, when the alleged abuse occurred. Thus, he asserts that by erroneously presenting all priests as holy, trustworthy, and sacred, the Diocese violated its duty to warn his parents about dangerous priests in the church. However, as the district court concluded, the record supports the Diocese's claim that it had no knowledge of any pedophilic priests within St. Mary's or the Diocese of Boise until 1985. Unlike in *Fortin* and *Greensburg*, where the defendants had knowledge of *specific misconduct* and the risk posed by *specific priests*, the record here contains no evidence that, at the time the alleged abuse occurred, the Diocese of Boise, St. Mary's, or anyone else knew of a single incident of sexual abuse perpetrated by Father O'Sullivan or any of the other parish priests. The Diocese of Boise's records contain no findings or reports of sexual abuse committed by Father O'Sullivan before or after Leriget's allegation in 2019. Church clergy from the Diocese of Boise also testified that they had no knowledge of any other allegations against Father O'Sullivan for sexual abuse.

Leriget points to Father O'Sullivan's confidential "priest file," in which there are several references to Father O'Sullivan's ongoing struggles with alcoholism. He argues that a reasonable jury might conclude that "alcoholism," as used in the file, was a code word for "pedophilia." If so, he asserts that the jury could find that the Diocese of Boise was aware of and failed to disclose this danger. However, even construing these facts in a light most favorable to Leriget, this assertion is highly speculative and based solely on conjecture. Not even a mere scintilla of evidence supports such an inference. Father O'Sullivan's file includes several reports of his alcoholism, including a stay in a rehabilitation center. The record also establishes that Father O'Sullivan would come over to Lerigets' house for dinner and drink "a lot of alcohol." Leriget recounted seeing him "stumbling"

10

drunkenly as he departed the Leriget home "at the end of the evening." Thus, it seems highly likely that the references to "alcoholism" in his priest file were not used as a code, but in reference to Father O'Sullivan's legitimate problem with alcohol abuse.

In the absence of any evidence disputing the Diocese's position, we conclude that the district court correctly determined that summary judgment was proper because "[a]ny finding by a jury that the Diocese was aware that Father O'Sullivan was a pedophile would not be reasonable" considering the evidence before it. Accordingly, we must affirm.

## C. We need not address the district court's remaining rulings.

Below, the district court rejected the Diocese's argument that Leriget's claims are time-barred based on the equitable doctrine of laches. The Diocese raised its laches argument on appeal as an alternative basis for affirming the district court's grant of summary judgment; however, we need not address this ruling because we affirm the district court's grant of summary judgment on the primary grounds stated by the district court.

The district court also granted summary judgment on the grounds that further inquiry into the Catholic Church's teachings and doctrine regarding the spiritual role of a priest in a parishioner's life would violate the Free Exercise and Establishment Clauses of the First Amendment. Although Leriget has challenged that ruling on appeal, it is unnecessary for us to address this further. This Court typically declines to address constitutional issues on appeal when the matter may be resolved on other grounds. *City of Sandpoint v. Indep. Highway Dist.*, 161 Idaho 121, 124, 384 P.3d 368, 371 (2016) ("It is well established that when a case can be decided upon a ground other than a constitutional ground, the Court will not address the constitutional issue unless it is necessary for a determination of the case." (quoting *Mullinix v. Killgore's Salmon River Fruit Co.*, 158 Idaho 269, 279, 346 P.3d 286, 296 (2015))). Here, where Leriget has failed in the first instance to establish the requisite facts necessary to bring a claim of constructive fraud, there is no need for us to examine the potential constitutional impediments to his claim addressed by the district court.

## IV.    CONCLUSION

For the reasons explained above, we affirm the district court's grant of summary judgment to the Diocese. Inasmuch as the Diocese is the prevailing party, it is entitled to costs as a matter of course pursuant to Idaho Appellate Rule 40(a).

Chief Justice BEVAN, and Justices Zahn and Meyer and Scott, J. Pro Tem, CONCUR.

11